Khalieb McKINNON et al., Plaintiffs,

v.

J. W. PATTERSON et al., Defendants.

No. 73 Civ. 3998.

United States District Court,
S. D. New York.

Sept. 13, 1976.

Richard A. Fuchs, Gage Andretta, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of the State of N. Y., Ralph McMurry, Asst. Atty. Gen., New York City, for defendants.

## OPINION

STEWART, District Judge:

Plaintiffs, Khalieb McKinnon, Laurence Mincy, and David Wheeler, have brought this civil rights action pursuant to 42 U.S.C. § 1983 to redress alleged deprivations of their constitutional rights.[1] Named as defendants are J. W. Patterson, who was the Superintendent of Eastern Correctional Facility in June of 1973 ("Eastern"), Joseph Perrin and Robert E. McClay, who, in June of 1973, were Deputy Superintendents at Eastern of Security and of Program Services respectively, Peter Preiser, then Commissioner of New York State's Department of Corrections, and Benjamin Ward, present Commissioner of New York State's Department of Corrections. Plaintiffs claim defendants violated their Fourteenth Amendment rights by imposing substantial deprivations upon plaintiffs without providing adequate procedural safeguards.

In June of 1973, the plaintiffs were incarcerated at Eastern, a "medium" security institution. 7 New York Code of Rules and Regulations ("N.Y.C.R.R.") § 100.55(b).[2] All were assigned to work in Eastern's laundry room. On June 5, 1973, a dispute arose between plaintiffs and defendants; plaintiffs claim that defendants altered the laundry room rules by abruptly prohibiting them from doing personal laundry. [Trial Transcript,[3] pp. 14–16]. Defendants testified that plaintiffs had attempted to use the laundry to do other inmates' laundry in return for compensation ("contract work"), a clear violation of prison rules. [Tr. pp. 162–165, Plaintiffs' Ex. 55 ("Inmate Rulebook", p. 4), Defendants' Ex. H ("Rules and Regulations at Eastern, Rule 18), and Ex. G]. All parties agree that a dispute occurred and that, subsequent to the dispute, the plaintiffs were confined to their cells ("keeplocked"). Correction officers filed "misbehavior" reports about plaintiffs and, some 15–20 days after the laundry incident occurred, plaintiffs were transferred from Eastern to other facilities. Mincy was sent to Clinton Correctional Facility ("Clinton"); McKinnon was transferred to Attica Cor-

---

1. Plaintiffs, who initially brought this action *pro se*, were represented at trial by Gage Andretta, Esq., and Richard Fuchs, Esq. The court thanks and commends Messrs. Andretta and Fuchs for providing competent and distinguished representation.

2. Unless otherwise indicated, all citations to Title 7 of N.Y.C.R.R. refer to the regulations in effect in 1973.

3. Hereafter, references to the trial transcript will be indicated by use of the abbreviation "Tr."

rectional Facility ("Attica"), and Wheeler was sent to Great Meadows Correctional Facility ("Great Meadows"). Each of these institutions is classified as a "maximum" security facility. 7 N.Y.C.R.R. §§ 100.5, 100.15, and 100.40.

Plaintiffs claim that the transfers were punitive measures which were imposed as a result of the laundry room incident. Plaintiffs argue that their keeplock and transfers worked substantial deprivations and that they were entitled to but did not receive adequate notice of or impartial hearings on the charges against them prior to imposition of the punishments. See *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). See also *Newkirk v. Butler*, 499 F.2d 1214 (2d Cir. 1974), *vacated as moot*, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). Specifically, plaintiffs seek a declaration that 1) the "adjustment committee procedure," an administrative hearing conducted by defendants did not comply with New York law or with the constitutionally mandated requirements of *Sostre v. McGinnis, supra* ; 2) the sanction of being keeplocked for some 15 days constituted a "substantial deprivation" within the prison setting and thus, before its imposition or immediately upon imposition, a fair and adequate hearing was and is required, and 3) defendants had personal knowledge of, or should have known of these constitutional defects and are thus to be held personally liable for plaintiffs' injury. Plaintiffs also request that this court 1) interpret New York State's regulations to require that, prior to a prisoner's transfer for misbehavior, a "superintendent's proceeding" [7 N.Y.C.R.R. § 253 *et seq.*] be held; 2) require that, before prisoners are transferred to a more restrictive institutional setting, a fair hearing be held; 3) remove transfer recommendations from the list of permissible actions which the adjustment committee may recommend; 4) require 24–hour notice of charges and hearings whenever an inmate is to be keeplocked for more than 3 days; 5) require that no adjustment committee member may participate in a hearing which deals with an incident in which that member had any involvement, and 6) order that plaintiffs' records be expunged so that any notations about the laundry room dispute and discipline related to it be deleted.

In addition to the equitable relief outlined above, plaintiffs seek monetary compensation for the constitutional deprivations, their lost wages, and their mental anguish.

Subsequent to the trial of this action on May 24–26, 1976, the Supreme Court issued its opinions in two cases which involve the rights of state prisoners to be given notice and hearings prior to the transfer from one prison institution to another. See *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) and *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Justice White, writing for the majority, held that the Due Process Clause of the Fourteenth Amendment does not, in itself, require hearings in connection with transfers from one institution to another "whether or not [the transfers] are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive." *Montanye v. Haymes, supra* at 242, 96 S.Ct. at 2547. The Court determined that a prisoner, seeking procedural protections for prison transfers, must look first to state law; the Due Process Clause only guaranteed that, once a right was established under state law, it would not be "arbitrarily abrogated." *Meachum v. Fano, supra* at 226, 96 S.Ct. at 2539, (citations omitted). Interpreting New York State's prison regulations in *Montanye v. Haymes*, Justice White concluded that, under New York law [N.Y.Corr.Law § 23(1)], a prisoner did not have a right to remain in any particular facility and had "no justifiable expectation that he would not be transferred unless found guilty of misconduct." *Montanye v. Haymes, supra* at 243, 96 S.Ct. at 2547.

On the bases of the holdings in *Montanye v. Haymes* and *Meachum v. Fano*, defendants urge that we enter judgment in their favor. [Supplemental Memorandum of

Law, June 30, 1976.] Defendants assert that, under the Supreme Court's interpretation of New York law, no state right and no constitutionally protected interests were infringed upon when plaintiffs were transferred from Eastern. [See *Montanye v. Haymes, supra,* 239–244, 96 S.Ct. 2547.] Further, defendants contend that plaintiffs' other claim, relating to the alleged inadequacy of the adjustment committee hearings which were held, is also decided by the Supreme Court's conclusions in the *Haymes* and *Fano* cases; defendants argue that, if *no federally protected remedy exists to insulate inmates from the deprivations suffered when transferred,* the "minor deprivations" [Supplemental Memorandum at p. 4] imposed by the adjustment committee cannot be federally protected, and thus, no due process requirements can be constitutionally mandated.

Plaintiffs submit that *Haymes* and *Fano* announced new rules of law, not foreshadowed by earlier holdings, and that these rulings should not be given retroactive application. See *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). See also *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In support of this argument, plaintiffs note that the events at issue here occurred in 1973, three years prior to the *Haymes* and *Fano* decisions; thus, the standards set forth in *Sostre v. McGinnis, supra,* should govern the adjudication of this action. Plaintiffs direct the court's attention to several written documents of defendants and of New York State which indicate that defendants, as well as plaintiffs, believed that the *Sostre v. McGinnis* ruling was applicable to these events. First, plaintiffs cite the brief submitted by New York State, in its appeal in *Newkirk v. Butler, supra.* New York stated that its rules required hearings prior to disciplinary punishment; when prisoners were transferred for reasons of misconduct,

". . . the inmate must, before or shortly after such transfer, be given notice of the gravamen of the misconduct and an opportunity to be heard in rela-

tion thereto." [Plaintiffs' Supplemental Post-trial Memorandum at p. 3.]

Second, in this action, defendants have consistently maintained that no hearings were required because plaintiffs were not transferred for punitive reasons but for "management" and "administrative" purposes. Thus, defendants have argued that "the applicable law at the time for disciplinary proceedings . . . *Sostre v. McGinnis*" [Defendants' Post-trial Brief at p. 26] did not require hearings here.

Justice Burger discussed the question of retroactive application of a constitutionally mandated decision in *Lemon v. Kurtzman,* 411 U.S. 192, 197–201, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) ("Lemon II").

"The process of reconciling the constitutional interests reflected in a new rule of law with reliance interests founded upon the old is 'among the most difficult . . .' [T]he effect of a given constitutional ruling on prior conduct 'is subject to no set "principle of absolute retroactive invalidity" but depends upon a consideration of "particular relations . . . and particular . . . conduct . . . of rights claimed to have become vested . . ."; and "of public policy . . ."'" *Lemon II, supra* at 198–199, 93 S.Ct. at 1468. (citations omitted).

See also *Gosa v. Mayden,* 413 U.S. 665, 673, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973), *Chevron Oil v. Huson, supra,* and *Dematteis v. Eastman Kodak Co.,* 520 F.2d 409 (2d Cir. 1975). While these cases do not discuss the precise question here, which is to determine whether holdings which limit a federal constitutional remedy should be applied retroactively, the opinions set forth the relevant considerations to guide us.

The preliminary question is whether a ruling of the Supreme Court "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . ." *Chevron Oil v. Huson, supra,* 404

U.S. at 106, 92 S.Ct. at 355 (citations omitted).[4] We agree with plaintiffs that the pronouncements of the Supreme Court in *Haymes* and *Fano* are "new" and do overrule the precedents developed in the lower courts of this circuit which had determined that the Due Process Clause, in itself, applied to all situations in which a state prison authority imposed punitive sanctions; thus, before a disciplinary transfer, the state had to afford the person to be punished an opportunity to be heard.[5]

Having determined that the rulings are new, we turn to the other factors which are relevant to the question of retroactive application. We are directed to look to the purpose of the new rule in order to decide whether retrospective operation "will further or retard its operation." *Lemon II, supra,* 411 U.S. at 199, 93 S.Ct. at 1469 (citations omitted). The purpose of the new holdings is, we believe, to direct federal courts to refrain from overseeing state prison administrative decisions, where federal constitutional rights are not at issue.[6] The Supreme Court expressly declined to place the Due Process Clause

> "astride the day-to-day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges."

*Meachum v. Fano, supra* at 228, 96 S.Ct. at 2540.

Thus, we believe that, if we were to decline to apply the rulings retroactively, we would be retarding their operation.

Another consideration in retroactivity is the degree of reliance the parties have placed upon the old rule. Here, we are confronted with a situation distinct from most in which courts have considered the problem of retroactive application.[7] While both sides relied upon the earlier holdings, defendants believed that their actions were proper under *Sostre v. McGinnis* and that they were not required to provide hearings before transferring prisoners because such transfers did not work "substantial deprivations." Plaintiffs rely upon the prior case law to obtain redress for past actions taken against them; plaintiffs do not allege that their own actions were authorized by the prior law.

■■■■ In light of the fact that the purpose of the *Haymes* and *Fano* rulings would be impeded if not applied retroactively, we believe that we must apply those rulings to the events at issue in this lawsuit. Thus, we conclude that, as the Supreme Court has construed New York law to establish no expectation of a right to remain in a particular institution, plaintiffs have not suffered

---

4. In this regard, it is not necessary that the ruling overturn Supreme Court precedent for "[o]nly a small number of the appealed federal cases are ever reviewed by the Supreme Court." *United States v. Bowen,* 500 F.2d 960, 976 (9th Cir. 1974) (citations omitted), *aff'd.* 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975).

5. See, e. g., *United States ex rel. Haymes v. Montanye,* 505 F.2d 977, 980 (2d Cir. 1974) [rev'd, *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466], holding that "[w]hen harsh treatment is meted out to reprimand, deter, or reform an individual, elementary fairness demands that the one punished be given a satisfactory opportunity to establish that he is not deserving of such handling," and *Newkirk v. Butler,* 499 F.2d 1214, 1218 (2d Cir. 1974), *vacated as moot,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975), holding that ". . . a substantial deprivation of benefits and privileges within the prison walls itself entitles a prisoner to some form of due process . . .".

6. Where a "fundamental constitutional guarantee" is involved, "federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez,* 416 U.S. 396, 405–406, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

7. Compare *Lemon II,* in which the parties had acted pursuant to a state statute later declared to be unconstitutional. See also *City of Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1190, 26 L.Ed.2d 523 (1970), in which the Court had to determine whether to invalidate an election which was held under laws later held to be discriminatory, and *Linkeletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), in which the Court declined to apply the exclusionary rule announced in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) to convictions which had become final before its rendition.

a Fourteenth Amendment deprivation because they were transferred from one institution to another without having first had an opportunity to be heard. Plaintiffs' fourth claim for relief against the defendants is dismissed.

We turn now to plaintiffs' other causes of actions. Plaintiffs' second claim for relief asserts that the transfers had and have the effect of "deterring and preventing plaintiffs from the free exercise of their rights of speech, petition, assembly and association under the Fire and Fourteenth Amendments." [Third Amended Complaint, ¶ 28.] As a third claim for relief, plaintiffs allege that the transfers occurred "in retribution for plaintiffs' institution of this suit." [Third Amended Complaint, ¶ 31] which they had begun after having been confined to their cells but before the transfers occurred. [Tr. pp. 41–47, 82–87, 133–134, Plaintiffs' Ex. 1, Defendants' Ex. A.]

Justice Steven's dissenting opinion in *Montanye v. Haymes, supra,* 427 U.S. at 244, 96 S.Ct. at 2548, interprets the majority holding as not precluding such claims, which allege that transfers are made "in retribution for [the] exercise of protected rights." Thus, we do not dismiss plaintiffs' second and third claims but turn to a review of the evidence to determine if plaintiffs have shown that defendants were motivated to transfer plaintiffs as retribution for plaintiffs' exercise of First and Fourteenth Amendment rights.

Both plaintiffs and defendants agree that the initial event which sparked the controversy was the dispute in the laundry room. [Tr. pp. 11, 128, 152, 315.] Further, both sides concur that the dispute arose when plaintiffs and defendants disagreed about prison policy and rules relating to inmates washing their own and other inmates' personal laundry. [Tr. pp. 20, 140, 354–355.] Credible testimony also establishes that, because of the disagreement over prison rules,

the inmates did not do their assigned work in the laundry on June 5, 1973. [Tr. pp. 19, 68, 89, 163, 308.]

▮ Inmates do not have a constitutionally protected right to perform any particular kind of work in state institutions or to protest prison regulations by a work stoppage. See *Paka v. Manson,* 387 F.Supp. 111 (D.Conn.1974). Thus, because we find on the basis of credible evidence that the plaintiffs were transferred primarily because of their participation in the laundry room incident [Tr. pp. 27, 232, Plaintiffs' Ex. 13, 15, 20], we decline to hold that the transfers were motivated by defendants' desire to punish plaintiffs for exercising constitutionally protected rights. We reach this conclusion despite the fact that plaintiffs have alleged that they were denied their constitutionally protected right of access to the courts. See *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) and *Butler v. Preiser,* 380 F.Supp. 612, 620 (S.D.N.Y.1974). Plaintiffs claim that, before they were transferred from Eastern, they had drafted a complaint seeking to enjoin the transfer [Tr. p. 85, Plaintiffs' Ex. 1, Defendants' Ex. A]; that action became moot when the transfers occurred. Second, plaintiffs allege that, after they were transferred, they were unable to confer with each other and thus the prosecution of this action was delayed. [Tr. p. 87.] However, both of these claims relate to the *effect* of the transfer and not to defendants' motivation for ordering the transfers. As plaintiffs have not shown that the transfers were prompted by defendants' desire to deter plaintiffs from bringing claims to court, plaintiffs' second and third claims for relief. are dismissed.[8]

▮ Finally, we come to plaintiffs' first cause of action, which seeks redress for the allegedly inadequate hearing procedures which were provided by defendants prior to the imposition of keeplock. [Third Amend-

---

8. Testimony by plaintiffs McKinnon and Mincy that a civilian employed at Eastern as a notary public declined to notarize one of two *pro se* complaints [Tr. pp. 43–44, 84–87, Plaintiffs' Ex. 2] is insufficient to establish that defendants acted to block plaintiffs from bringing their claims to court.

ed Complaint, ¶¶ 22–25.] [9] This cause of action is not precluded by the Supreme Court decisions in *Montanye v. Haymes* and *Meachum v. Fano* because New York State law provides that certain procedures be followed when an inmate is subjected to confinement in his or her cell. See 7 N.Y.C. R.R. §§ 250–252. Thus, the Due Process Clause applies "to insure that the state-created right is not arbitrarily abrogated." *Meachum v. Fano, supra,* 427 U.S. 226, 96 S.Ct. 2539, 49 L.Ed.2d 451 (citations omitted). Furthermore, under the governing federal law of the time, *Sostre v. McGinnis, supra,* "substantial deprivations" could not be imposed unless a fair and rational inquiry were conducted. Thus, as confinement to a cell for fourteen days constitutes a "substantial deprivation," [10] we must scrutinize the manner in which the state reached its decision to keeplock plaintiffs. We must determine if the prisoners were confronted with the accusations and the evidence against them and afforded a reasonable opportunity to explain their actions. *Sostre v. McGinnis, supra,* 442 F.2d at 198. [11]

To ascertain whether New York officials complied with the procedures set forth in the state's regulations and with due process requirements, we turn to the evidence presented at trial. Based upon the testimony and exhibits, we make the following findings of fact.

1. The dispute in the laundry on June 5, 1973, at Eastern was an unusual event in that institution's history. [Tr. pp. 289–293.]

2. After the inmates who had been present in the laundry room during the dispute returned from lunch, they were confined to their cells. [Tr. pp. 23, 69–71, 129, 310.]

3. Misbehavior reports were written about all the inmates who were present in the laundry. [Tr. p. 153, Plaintiffs' Ex. 38–54.]

4. Within a day of the incident, three prison personnel, correction officer George Barthel, Lieutenant Demskie, and civilian employee Edward Hartley, interviewed approximately one-third of the inmates who had been keeplocked. After the interviews, these inmates were released from keeplock. The misbehavior reports written about them were apparently withdrawn. [Tr. pp. 155–158, 166, 175, 187–188, 266–267, 376.]

5. In addition to the individual misbehavior reports filed, the employees who witnessed the incident in the laundry room filed reports describing the events. [Tr. pp. 243–244, Defendants' Ex. C, E] One of these reports was filed several weeks after the incident occurred. [Tr. p. 359, Defendants' Ex. F]

6. Laurence Mincy was interviewed by the adjustment committee on June 7, 1973. After a brief discussion, Mincy was told that he would be confined to his cell for seven days, would be interviewed again at the end of that time, and that the committee intended to recommend a change in his job assignment. [Tr. pp. 26–29, Plaintiffs' Ex. 30.]

---

**9.** At the conclusion of the trial, plaintiffs withdrew their fifth claim for relief, which alleges that they (who are all black) were "deliberately and intentionally treated more harshly by defendants than white inmates in the prison had been treated . . . solely because of the plaintiffs' race." [Third Amended Complaint, ¶ 40.]

**10.** See *United States ex rel. Larkins v. Oswald,* 510 F.2d 583 (2d Cir. 1975), *Gilliard v. Oswald,* # 73 Civ. 249 (N.D.N.Y., July 22, 1976), and *United States ex rel. Walker v. Mancusi,* 338 F.Supp. 311 (W.D.N.Y.1971), *aff'd.* 467 F.2d 51 (2d Cir. 1972).

**11.** We do not read *Haymes* and *Fano* as precluding inquiry into the hearing afforded before disciplinary sanctions involving deprivations of liberty are imposed. We note that *Haymes* and *Fano* did not overrule the Supreme Court's recent decisions concerning prison disciplinary hearings [See, e. g., *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) and *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)] but dealt instead with the question of hearings prior to transfer from one prison facility to another. Justice White evaluated the transfer question in a context where no constitutional guarantee established that a state must provide alternative prison settings and where no state law entitled inmates to expect assignment to any particular facility.

7. Mincy was not interviewed again by the adjustment committee before he was transferred from Eastern on June 20, 1973. [Tr. p. 29.]

8. On June 7, 1973, Khalieb McKinnon appeared before the adjustment committee. He was shown a copy of the charges relating to the laundry room dispute; after he spoke briefly about his involvement, the committee told him that they would recommend he be kept in keeplock for seven days, his job assignment changed, and he be returned for another interview. [Tr. pp. 72–82, 88, Plaintiffs' Ex. 28.]

9. McKinnon was not interviewed again by the adjustment committee. [Tr. p. 88.]

10. David Wheeler met with the adjustment committee on approximately June 7, 1973. After a brief exchange, Wheeler was told he was to be confined to his cell for seven days and would then be returned to the adjustment committee for further interviewing. [Tr. pp. 129–131, Plaintiffs' Ex. 35.]

11. Wheeler was not interviewed again by the adjustment committee. [Tr. pp. 130, 212.]

12. The plaintiffs did not have the opportunity of bringing other persons to speak to the adjustment committee to substantiate the plaintiffs' description of the causes of the laundry dispute. [Tr. pp. 77, 131, 264.]

13. None of the plaintiffs were informed that they could request that the superintendent review the recommendations of the adjustment committee. [Tr. pp. 29, 77, 131.]

14. The evidence does not establish that the adjustment committee was directly responsible for the transfers or that it did recommend changes in programs for the plaintiffs.[12]

15. When keeplocked, McKinnon, Mincy, and Wheeler were confined to their cells. They had the use of their personal property [Tr. pp. 98, 138, 250.] They had very limited access to showers and physical activity. [Tr. pp. 79, 108, 137.] They could not participate in the normal routine of the prison, work at their assigned jobs, receive wages for such work, or take part in educational offerings. [Tr. pp. 32, 91, 131, 138.] They spent from 23 to 24 hours per day in their cells. They were denied contact with other inmates during their confinement.

New York State requires that

"[a]ll control of inmates' activities, including disciplinary action, must be administered in a completely fair, impersonal and impartial manner and must be as consistent as possible (given the need for individualized decisions)." 7 N.Y.C.R.R. § 250.2(d).

Further,

"[d]isciplinary action must never be arbitrary or capricious, or administered for the purpose of retaliation or revenge." 7 N.Y.C.R.R. § 250.2(e).

We find that the manner in which defendants handled the disciplinary problem which arose in June of 1973 at Eastern complied in many but not all respects with New York State regulations.

■ New York empowers correction officers who reasonably believe that there is an imminent threat to the security of an institution or to the safety of inmates to confine inmates to their cells. 7 N.Y.C.R.R. § 251.-6(a). Thus, the officers who keeplocked plaintiffs on June 5 were not in violation of New York regulations. We find that they had reasonable grounds to conclude that the unusual events of that morning might provoke further disruption and that locking inmates in their cells would be proper. The officers were not under any obligation to

---

**12.** We note that the "classification committee evaluations" of plaintiffs, which recommended transfer to maximum security facilities, mention the plaintiffs' participation in the laundry room incident as indicative of their poor adjustment to a medium security facility. [Plaintiffs' Ex. 14, 15, 20.] However, the evidence does not establish that it was the adjustment committee which conveyed this information to the classification committee either directly or through the program committee. Further, there is no evidence that the transfers occurred in a manner which violated state law.

inform inmates in advance of the keeplock that confinement was planned.

Once an officer confines an inmate, he or she must file a report with the superintendent of the facility. 7 N.Y.C.R.R. § 251.6(d). Here, reports were made, and some were forwarded to the adjustment committee, as required under 7 N.Y.C.R.R. § 252.3(b)(1).

The adjustment committee, which consists of three State employees who are designated by the Superintendent [7 N.Y.C.R.R. § 252.1] is required to review the reports to "ascertain the full and complete facts and circumstances of the incidents of inmate misbehavior." 7 N.Y.C.R.R. § 252.2(a). The committee must determine if the "facts and circumstances are set forth with sufficient clarity . . . to furnish a basic understanding of the matter." 7 N.Y.C.R.R. § 252.4(c). "The committee also shall endeavor to obtain from the inmate as full and complete an explanation of his behavior in the situation as possible." 7 N.Y.C.R.R. § 252.4(e).

Here, as required under the regulations, the adjustment committee interviewed each inmate at its first meeting following the date of the inmate's confinement.[13] 7 N.Y.C.R.R. § 252.3(f). No specific procedures for the interview are set forth in the regulations. The committee is given the discretion to determine what information it requires [7 N.Y.C.R.R. § 253.3(d)] and to elicit more information when necessary. Further, under New York law, members of the adjustment committee are chosen by the superintendent; there is no requirement that the members have no prior knowledge or involvement with the misbehavior reports which they review.[14]

We find that, while the actions of the adjustment committee in interviewing the plaintiffs complied with the New York's regulations, described above, the committee failed to provide the procedural safeguards required under the Constitution. As set forth in *Sostre v. McGinnis, supra,* when a prisoner is confronted with the potential imposition of a substantial deprivation, certain procedural protections attach. Here, New York State did not give plaintiffs the opportunity to be informed of the charges against them in advance of the hearings or to have the incident reviewed by persons who had no prior involvement with the event.[15] Thus, the "interview" did not provide the type of hearing required before the imposition of the punishment which the adjustment committee ordered.

The subsequent actions of the adjustment committee were proper under New York law, and except for our conclusion as to the inadequacy of the hearings prior to the imposition of keeplock, did not violate due process. Under New York regulations, the adjustment committee could recommend to the superintendent that an inmate's program be reappraised, 7 N.Y.C.R.R. § 252.4(b)(7). In making this recommendation or in taking any other action, the committee, which need not make any findings of violation of prison policy, must focus upon "the need for maintaining discipline and order within the facility." 7 N.Y.C.R.R. § 252.5(b). If the committee believes that an inmate's activities must be restricted, it may recommend different sanctions, including confining an inmate to his or her cell for a period not exceeding two weeks, 7 N.Y.C.R.R. § 252.5. After imposition of such restriction, the

> "committee *may* direct that the inmate appear before it at a specified time during the period of the restriction, or at the expiration thereof, . . . Where the committee is of the opinion that . . . a change [in attitude] has not occurred, it may add restrictions . . ." 7 N.Y.C.R.R. § 252.5(f) (emphasis added).

---

**13.** There was no evidence that the adjustment committee had a regular meeting earlier than June 7, 1973.

**14.** Compare 7 N.Y.C.R.R. § 253.2(d).

**15.** Lieutenant Demskie, who sat on the adjustment committee, was also present outside the laundry room on June 5th and participated in the ad hoc panel's interviews of some inmates.

Thus, despite the fact that plaintiffs were told that they would be returned to the committee in seven days, the failure to do so did not breach a statutory mandate. Further, while plaintiffs complain that they were not informed of their right to initiate a review of the adjustment committee's actions by means of a written request to the superintendent [7 N.Y.C.R.R. § 270.1(c)], the regulations governing adjustment committee procedures do not require that the committee inform inmates of this option.[16]

■ In some respects, however, the administration at Eastern did depart from New York regulations. First, and most importantly, the regulations do not provide for an ad hoc panel of employees selecting some inmates for private interviews and determining to withdraw misbehavior reports. We find that such procedures contradict the "general policies on discipline," which mandate that disciplinary administration be "fair . . . impartial . . and as consistent as possible . . ." [7 N.Y.C.R.R. § 250.2(d)]. Similarly, the fact that two inmates were reinterviewed by the adjustment committee [Plaintiffs' Ex. 25, 36] while plaintiffs were not, undermines the regulations' philosophy of even-handed action. Finally, the adjustment committee's failure to interview plaintiffs after informing them of scheduled meetings did not comport with the description of committee's role of giving "guidance to the inmate." 7 N.Y.C.R.R. § 252.5(c).

■ We conclude that, because some inmates were interviewed and released under informal procedures, plaintiffs were deprived of their legal "interest or right" [*Meachum v. Fano, supra,* at 228, 96 S.Ct. at 2540] under New York law to have prison discipline applied under established procedural mechanisms. Further, we find that the interviews given by the adjustment committee were constitutionally insufficient. We therefore grant plaintiffs declaratory relief under their first cause of action and hold 1) confining an inmate to his or her cell for two weeks is a substantial dep-

rivation; 2) prior to the imposition of such deprivation, due process requires a fair hearing, and 3) that the procedures accorded to plaintiffs prior to keeplock violated their Fourteenth Amendment rights. Accordingly, we order that, in future adjustment committee proceedings involving keeplock, 1) formal written notification of the charges must be given to the inmate at least 24 hours before the hearing and 2) no one with direct, personal involvement in the incident upon which the complaint against the inmate is based may sit on that case. See *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), *Wolff v. McDonnell, supra, Sostre v. McGinnis supra.* See also *Powell v. Ward,* 392 F.Supp. 628 (S.D.N.Y.1975), *app. pending.*

■ Plaintiffs have also requested that we order that any reference to the laundry room incident and the subsequent disciplinary action be expunged from their records. We decline to do so because it is undisputed that plaintiffs were present in the laundry room at the time and participated in some manner in that dispute. Second, plaintiffs have not demonstrated that the existence of a record of the laundry dispute has caused them harm or that it will hinder their chances for parole.

■ We turn now to the question of a monetary award. Plaintiffs argue that the evidence established that defendants failed to act reasonably in light of the existing legal requirements and are therefore liable for damages. See *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) and *MukMuk v. Commissioner of Corrections,* 529 F.2d 272 (2d Cir. 1976) U.S. app. pending, U.S. (1976). Defendants' actions relating to the adjustment committee proceedings do not, in our opinion, demonstrate failure to act reasonably. Those interviews, while not satisfying the standards of *Sostre v. McGinnis, supra,* did comply with New York regulations in effect at that time; we believe it would be inappropriate to assess damages against defendants for adhering to

---

**16.** This regulatory omission, in our view, limits the usefulness of an inmate's right to seek

review by the superintendent but does not, in itself, violate due process.

**394**

those procedures. See *MukMuk v. Commissioner of Corrections, supra,* 529 F.2d at 278. Further, while the activities of the ad hoc panel which interviewed some inmates and released them from keeplock cannot be characterized as a good faith attempt to comply with legal requirements, plaintiffs have not been damaged by those actions. Thus, we decline to assess monetary damages against defendants. No costs to either party.

SO ORDERED.