Khalieb McKINNON, Laurence Mincy
and David Wheeler, Plaintiffs-Appel-
lees and Cross-Appellants,

v.

J. W. PATTERSON, Joseph W. Perrin,
and Robert E. McClay, Individually and
as former officials of Eastern Correc-
tional Facility, and Benjamin Ward and
Peter Preiser, as present and former
Commissioners of Corrections of the
State of New York, Defendants-Appel-
lants and Cross-Appellees.

Nos. 820, 821, Dockets 76–2153, 76–2168.

United States Court of Appeals,
Second Circuit.

Argued March 18, 1977.

Decided Sept. 15, 1977.

Certiorari Denied Feb. 21, 1978.

See 98 S.Ct. 1282.

Gage Andretta, New York City (Richard A. Fuchs, New York City, on the brief), for plaintiffs-appellees and cross-appellants.

Ralph McMurry, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., State of N. Y., and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, on the brief), for defendants-appellants and cross-appellees.

Before LUMBARD and TIMBERS, Circuit Judges, and DAVIS,* Court of Claims Judge.

TIMBERS, Circuit Judge:

These are cross-appeals by state prisoners and state prison officials from a judgment entered October 12, 1976 in the Southern District of New York, Charles E. Stewart, *District Judge*, 425 F.Supp. 383, which granted declaratory relief with respect to certain constitutional infirmities the court found in prison disciplinary proceedings but denied monetary relief.

One of the essential questions presented is whether and to what extent the rule of *Wolff v. McDonnell*, 418 U.S. 539 (1974), requiring 24-hour advance written notice of charges in certain prison disciplinary proceedings, applies to proceedings in which the sanction for misbehavior may be "keep-lock" of not more than two weeks. We affirm the judgment as modified.

* Hon. Oscar H. Davis, Judge, United States Court of Claims, sitting by designation.

## I. FACTS AND PRIOR PROCEEDINGS

The events that gave rise to this action began on June 5, 1973 in the laundry room of Eastern Correctional Facility at Napanoch, New York. Eastern is a medium security prison. The three prisoners named as plaintiffs were assigned to work in the laundry room. On June 5 a dispute took place between prisoners in the laundry room and certain corrections officials. Just what caused the dispute remains unclear: the prisoners contend that the officials would not let them do "personal" laundry, while the officials say the prisoners were violating prison rules by attempting to do "contract" laundry, or laundry for other inmates for a profit. For our purposes the underlying cause of the dispute is irrelevant. The relevant thing was the result. The prisoners in the laundry room refused to work; and after lunch that day they were confined to their cells ("keeplocked").

By the following day some of the prisoners had been interviewed by prison personnel and released from keeplock. Their misbehavior reports were withdrawn. Other prisoners, including plaintiffs, were kept in keeplock and their misbehavior reports were sent to the Adjustment Committee. The Committee met and held hearings on June 7. The prisoners were informed of the charges against them at their individual hearings, but not before; and they were given an opportunity to respond. The Committee imposed on each prisoner, including plaintiffs, punishment of seven days keeplock. Although each prisoner was told he would be reinterviewed (or given a "review") after seven days, 7 N.Y. Code of Rules and Regulations § 252.5(f) (1973), none of the plaintiffs was given a second interview. They were kept in keeplock for two weeks.

In keeplock plaintiffs were confined to their own cells 23 to 24 hours a day. They were denied contact with other inmates and could not participate in the normal routine of the institution, were not allowed to work at their jobs or earn wages, and had limited access to showers and physical activity.

The Program Committee, which is responsible for inmate assignments, met on June 8 and recommended that plaintiffs be transferred out of Eastern. After the recommendations were approved by defendant Patterson, then Superintendent of Eastern, the transfers were approved by defendant Preiser, then Commissioner of Corrections. At the end of June, each of the plaintiffs was transferred to a different maximum security institution. Defendant McClay, then Deputy Superintendent of Eastern, testified that the Program Committee's recommendations "could have" been based on the Adjustment Committee's determinations the day before.

In their action commenced September 19, 1973, plaintiffs claimed that they had been deprived of their constitutional rights guaranteed by the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983 (1970). The parties agree that of the five claims asserted only the first is relevant to the instant appeals. In that claim plaintiffs alleged that they had been punished, by confinement in keeplock and then by transfer to maximum security prisons, without adequate notice or hearings, in violation of the due process clause of the Fourteenth Amendment. They requested declaratory and injunctive relief, expungement from their records of any mention of the laundry incident, and monetary damages from all defendants except defendant Ward who became Commissioner after the events in question.

Following a three day trial in May 1976 the district court filed its opinion which ordered dismissal of all of plaintiffs' claims except the one stated above, the first claim. Plaintiffs have not appealed with respect to the dismissed claims. As to the first claim the court held that plaintiffs had no right to a hearing before being transferred to other facilities, citing the Supreme Court's recent decisions in *Meachum v. Fano*, 427 U.S. 215 (1976), and *Montayne v. Haymes*, 427 U.S. 236 (1976); but it held that the hearings given plaintiffs were constitutionally inadequate because the Adjustment Committee was not an impartial tribunal and because plaintiffs did not receive ade-

quate notice of the charges against them.[1] The court rejected plaintiffs' contention that the Adjustment Committee had breached New York regulations by failing to reinterview plaintiffs after seven days in keeplock. Accordingly, the court ordered that

"in future adjustment committee proceedings involving keeplock, 1) formal written notification of the charges must be given to the inmate at least 24 hours before the hearing and 2) no one with direct, personal involvement in the incident upon which the complaint against the inmate is based may sit on that case." 425 F.Supp. at 393.

The court refused to award damages or to order that references to the laundry room incident be expunged from plaintiffs' records.

Plaintiffs appeal from so much of the judgment as denied their requests for monetary relief and expungement. Defendants appeal from so much of the judgment as requires them to give 24 hours advance written notice of charges before keeplock may be imposed and from the grant of relief to anyone other than the three named plaintiffs, insofar as the court's decision may be read to provide such relief.

## II. DISCUSSION

### (A) PLAINTIFFS' APPEAL

The two issues raised on plaintiffs' appeal are whether the district court erred in refusing (1) to award damages and (2) to order expungement. We hold that the court did not err in either respect.

### (1) Damages

Plaintiffs contend that the court should have awarded damages for several distinct violations of their constitutional rights.[2] Assuming arguendo that plaintiffs' contentions regarding violations of their rights were meritorious,[3] their appeal as to this

---

**1.** The court's holding on this point was as follows:

"1) confining an inmate to his or her cell for two weeks is a substantial deprivation; 2) prior to the imposition of such deprivation, due process requires a fair hearing; and 3) that the procedures accorded to plaintiffs prior to keeplock violated their Fourteenth Amendment rights." 425 F.Supp. at 393.

We understand the court's decision, as to both the unconstitutionality of the hearings and the grant of relief, to have been based on *Sostre v. McGinnis*, 442 F.2d 178 (2 Cir. 1971), *cert. denied*, 404 U.S. 1049 (1972). Whatever doubts there may be as to the specificity of *Sostre's* requirements as of 1973 when the Adjustment Committee hearings in question were held, see note 3 *infra*, we have analyzed plaintiffs' claim for declaratory relief under the law as it stands today, i. e. under *Sostre*, and the Supreme Court's decision in *Wolff v. McDonnell*, 418 U.S. 539 (1974), upon which the district court based its grant of relief.

**2.** Specifically the alleged violations for which plaintiffs sought damages were the constitutionally inadequate procedure at the Adjustment Committee hearings; discrimination among inmates in that some chosen at random were released from keeplock after informal interviews and their misbehavior reports were withdrawn; failure to review plaintiffs' keeplock status after seven days as originally indicated; and the transfers to other institutions that allegedly resulted from the defective Adjustment Committee hearings.

**3.** Candor compels us to note our doubts about the court's conclusion that the hearings afforded plaintiffs were unconstitutional at the time they were held in 1973. The events in question antedated the Supreme Court's decision in *Wolff v. McDonnell, supra*; so the governing standard at the time was our own *Sostre v. McGinnis, supra*. Whether the hearings complained of amounted to a denial of due process under *Sostre* is a debatable question, and one we need not resolve here. Its resolution would be of no more than academic interest. Our doubts spring from the fact that the opinion in *Sostre* was vague as to the minimal requirements of due process in the prison context; it specifically refused to impose a "constitutional harness" on state prison officials. 442 F.2d 178 at 197. The closest *Sostre* came to defining the rudiments of due process was the following, often quoted in subsequent decisions:

"If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, . . . and afforded a reasonable *opportunity to explain his actions*." (citations omitted) *Id.* at 198.

issue must fail on other grounds. The district court was correct in refusing to award damages on the grounds that plaintiffs did not demonstrate the requisite personal involvement of certain of the defendants in the alleged constitutional deprivations; and, as to the other defendants, plaintiffs failed to prove that they acted unreasonably or in bad faith so as to deprive them of official immunity.

◼ In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Mukmuk v. Commissioner of Department of Correction Services*, 529 F.2d 272, 275 (2 Cir.), *cert. denied*, 426 U.S. 911 (1976); *Johnson v. Glick*, 481 F.2d 1028, 1033–34 (2 Cir.), *cert. denied*, 414 U.S. 1033 (1973); *Sostre v. McGinnis, supra*, 442 F.2d at 205; see *United States ex rel. Larkins v. Oswald*, 510 F.2d 583, 588–89 (2 Cir. 1975); *Martinez v. Mancusi*, 443 F.2d 921, 924 (2 Cir. 1970).

◼ We are satisfied that defendant Preiser, the former Commissioner of Corrections, was not sufficiently involved in the alleged denial of due process to subject him to personal liability.[4] There was no evidence that he participated directly in the Adjustment Committee hearings, that he had knowledge of what went on at the hearings, that he had reason to suspect that there had been any wrongdoing, or that he had direct responsibility for or control over the Adjustment Committee. The fact that he was in a high position of authority is an insufficient basis for the imposition of personal liability. *Johnson v. Glick, supra*, 481 F.2d at 1034.

◼ Nor are plaintiffs entitled to damages from the defendant officials who were at the prison (Superintendent Patterson and Deputy Superintendents Perrin and McClay). These defendants pleaded and proved that they acted reasonably and in good faith. They therefore were entitled to the defense of official immunity as to all but one of the alleged defects with which they could be said to have been personally involved. *Wood v. Strickland*, 420 U.S. 308 (1975); *Mukmuk v. Commissioner of Department of Correctional Services, supra; Knell v. Bensinger*, 522 F.2d 720 (7 Cir. 1975). *Wood v. Strickland* held that an official seeking to avail himself of the defense of immunity "must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges." 420 U.S. at 322.

We are not convinced that the standard of *Wood v. Strickland* has been met here. At the time of the hearings in question the contours of prisoners' procedural rights

Since *Sostre* did not mandate *advance* notice, let alone written notice 24 hours in advance of the hearing, and considering the relatively uncomplicated factual inquiry at the hearings in the instant case, it is not clear that the *Sostre* standard at the time of these hearings had evolved as far as plaintiffs claim.

Furthermore, the deprivation visited upon these plaintiffs was far milder than those in our early cases dealing with prisoners' rights. See, e. g., *Sostre, supra; Wright v. McMann*, 387 F.2d 519 (2 Cir. 1967). Indeed, in *United States ex rel. Walker v. Mancusi*, 467 F.2d 51 (2 Cir. 1972), we approved of Adjustment Committee hearings, as to which the prisoners were not given any advance written notice of the charges against them, which resulted in their confinement in a special housing unit. Although we either held implicitly or assumed for purposes of argument that such segregation was a substantial deprivation under *Sostre*, we concluded that due process was satisfied when the Superintendent "reviewed each case, in-

formed each inmate of the evidence against him, and gave him the opportunity to consent to continued restrictive confinement or to reply to the evidence against him." *Id.* at 53.

The district court's conclusion here that the hearings were inadequate, because of the presence on the Adjustment Committee of a corrections official who may have been involved in the laundry room incident is more tenable. See, e. g., *United States ex rel. Neal v. Wolfe*, 346 F.Supp. 569, 575 (E.D.Pa.1972); *Landman v. Royster*, 333 F.Supp. 621, 653 (E.D.Va.1971). Still, although an impartial tribunal is a basic component of due process and was considered such in 1973, it is not clear that keeplock was considered a "substantial deprivation" under *Sostre* so as to mandate even minimal due process standards.

4. Defendant Ward, the present Commissioner, was sued only in his official capacity for purposes of declaratory and injunctive relief. The damage issue therefore does not concern him.

were just starting to take shape. See note 3 *supra.* If the hearings were less than we consider constitutionally adequate today, it is because of the benefit of hindsight and particularly the guiding light of *Wolff v. McDonnell.* The cases which plaintiffs cite to indicate that the constitutional rights here in question clearly were established and unquestioned in June 1973 deal with forms of punishment harsher and of longer duration than two weeks in keeplock. These cases indicate that the courts were only beginning to fill in the details of procedural due process required in the context of prison discipline.

The alleged selective treatment of inmates stands on a different footing. *Wood v. Strickland,* and before it *Scheuer v. Rhodes,* 416 U.S. 232 (1974), established a dual subjective/objective test of good faith.

> "It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer v. Rhodes, supra,* 416 U.S. at 247–48.

Judge Stewart found that "because some inmates were interviewed and released under informal procedures, plaintiffs were deprived of their legal 'interest or right' under New York law to have prison discipline applied under established procedural mechanisms", citing *Meachum v. Fano, supra.* 425 F.Supp. at 393. The subjective test of good faith was not met. The judge concluded however that "while the activities of the ad hoc panel which interviewed some inmates and released them from keeplock cannot be characterized as a good faith attempt to comply with legal requirements, plaintiffs have not been damaged by those actions." *Id.* at 394. Accordingly he declined to award monetary damages.

We agree with that conclusion but not on the ground that plaintiffs were not damaged; rather, we hold that the defendants were not personally responsible for the ac-

tions of those who singled out some prisoners for more favorable treatment.

## (2) *Expungement*

■ There is no doubt, as Judge Stewart found, that plaintiffs participated in the work stoppage. If the Adjustment Committee hearings had been preceded by proper notice, plaintiffs might have been able to prove that they were coerced, were mere followers or passive participants, or had some other justifiable excuse. The same considerations which we have set forth above with respect to the claim for damages, however, apply likewise to the claim for expungement. The fact that the due process rights asserted by plaintiffs were not clearly established in 1973 cautions us against applying present standards "so as to require that prison records containing determinations of misconduct, not in accord with required procedures, be expunged." *Wolff v. McDonnell, supra,* 418 U.S. at 573–74.

We hold that the district court did not err in refusing to order expungement from plaintiffs' records of any mention of the laundry incident.

## (B) DEFENDANTS' APPEAL

The corrections officials press two main arguments on appeal. The first is directed at that provision of the judgment which requires 24 hours advance written notice of charges to be heard by the Adjustment Committee "involving keeplock". The second argument is that the same provision of the judgment is ambiguous and sweeps too broadly in that it seems to go beyond a declaration of rights to grant an injunction—an injunction not limited to plaintiffs despite the fact that this suit is not a class action.

## (1) *Notice*

In order to determine whether the notice provision of the judgment below was proper we must interpret the scope of the notice requirement laid down in *Wolff v. McDon-*

*nell, supra.*[5] *Wolff* held that 24 hours advance written notice of the charges is required before a prisoner can be deprived of good time or placed in " 'solitary' confinement" as punishment for "serious misbehavior". 418 U.S. at 571 n. 19. The Court qualified its holding by noting that solitary confinement

> "represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges." *Id.* at 571–72.

In the instant case we must determine where keeplock falls on the spectrum between loss of privileges at one extreme and forfeiture of good time or placement in solitary confinement at the other.

We begin by attempting to clarify how keeplock fits into the range of types of disciplinary confinement. There are three basic forms of punitive segregation: (1) keeplock, or "padlock", in which the prisoner is confined to his own cell and is deprived of almost all contact with the rest of the prison population and participation in the normal routine of the institution; (2) confinement in a special housing unit, usually a maximum security cellblock or building; and (3) solitary confinement, including "strip cells" or "dry cells", which contain no sink or toilet. See *Wolff v. McDonnell, supra,* 418 U.S. at 552 n. 9; *LaReau v. MacDougall,* 473 F.2d 974, 976–78 & n. 7, and authorities cited at n. 7 (2 Cir. 1972), *cert. denied,* 414 U.S. 878 (1973); Note, Decency and Fairness: An Emerging Judicial Role in Prison Reform, 57 Va.L.Rev.

841, 852 (1971). Obviously keeplock is the mildest form of punitive segregation. Yet, except for the fact that the prisoner is confined to his own cell and retains access to his personal belongings, the deprivations involved in keeplock are essentially the same as those involved in segregation in a special housing unit. The district court here so found, 425 F.Supp. at 391; see also *Cunningham v. Ward,* 546 F.2d 481 (2 Cir. 1976) (per curiam).

Many cases have held that punitive segregation in a special housing unit constitutes a "substantial deprivation" or "grievous loss", *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168 (1951), thereby triggering minimal due process requirements. E. g., *United States ex rel. Larkins v. Oswald,* 510 F.2d 583 (2 Cir. 1975); *United States ex rel. Miller v. Twomey,* 479 F.2d 701, 717 (7 Cir. 1973) (Stevens, J.), *cert. denied,* 414 U.S. 1146 (1974); *United States ex rel. Walker v. Mancusi,* 338 F.Supp. 311 (W.D.N.Y.1971), *aff'd,* 467 F.2d 51 (2 Cir. 1972); *Diamond v. Thompson,* 364 F.Supp. 659, 664 (M.D.Ala. 1973); *Sands v. Wainwright,* 357 F.Supp. 1062, 1082, 1086 (M.D.Fla.), *vacated and remanded on other grounds,* 491 F.2d 417 (5 Cir. 1973) (en banc), *cert. denied,* 416 U.S. 992 (1974); *Bundy v. Cannon,* 328 F. Supp. 165, 173 (D.Md.1971).

There are two problems however in relying on these cases to support a holding that keeplock of less than two weeks likewise is a substantial deprivation. First, it often is difficult to find a common denominator among the various terms used to describe different kinds of punishment and thereby to translate them into one language in which comparisons can be made. It may be that the forms of punishment considered in many pre-*Wolff* cases would fall under *Wolff's* definition of "solitary" confinement. On the other hand, it is arguable that even keeplock comes under *Wolff.* As we said in *Cunningham v. Ward, supra,* 546

---

**5.** We are not persuaded by defendants' argument that the district court impermissibly applied *Wolff* retroactively. Whatever may be said with respect to the application of *Wolff* standards to the 1973 hearing, notes 1 & 3 *supra,* the court's consideration of *Wolff* in the context of granting declaratory relief was proper.

F.2d at 483, "Footnote 19 in *Wolff* distinguishes between 'disciplinary confinement' and 'loss of privileges'; arguably keeplocking is a form of 'disciplinary confinement,' [that is, explicitly covered by the holding in *Wolff*], even though it is not ' "solitary" confinement' as that term is generally understood." [6] Second, in trying to fit the instant case into the framework of the case law we note that here the Adjustment Committee did not have the power to impose keeplock for more than two weeks and in fact imposed keeplock on these plaintiffs for only seven days. We have not been able to find any other case in which the maximum segregation provided for by regulation was as short as two weeks. In most of the cases the prisoners were confined for "indeterminate" terms and many prisoners remained in punitive confinement for weeks and even months.

The provision of the district court judgment here under consideration therefore takes us further down the path than we heretofore have gone in defining "grievous loss" or "substantial deprivation". Keeplock appears to be a milder form of punishment than solitary confinement or confinement in a special housing unit. Adjustment Committees in New York prisons cannot impose it for more than two weeks. The question thus presented is whether these differences take keeplock out of the class of punishments covered by *Wolff*. We conclude that they do not. We reach this conclusion for three reasons, one based on our reading of *Wolff*, one based on our own prior cases, and one based on practical considerations.

Our interpretation of *Wolff* begins with a look at the Nebraska state regulation that authorized the disciplinary sanctions there involved. It provided: "In cases of flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term . . . be forfeited or withheld and also that the person be confined in a disciplinary cell." 418 U.S. at 539

n. 5. The Court seems to have equated "disciplinary cell" with "solitary confinement", because it explained the former term more fully by describing the two forms of "solitary confinement" extant in Nebraska: "[The prisoner] may be incarcerated alone in the usual 'disciplinary cell,' with privileges severely limited, for as long as necessary, or he may be put in a 'dry cell'. . . ." *Id.* at 552 & n. 9. The Court contrasted these forms of punishment with the only other kind of punishment provided for by the Nebraska prison regulations: "If the misconduct is less than flagrant or serious, only deprivation of privileges results." *Id.* at 547. This leads us to the conclusion that unless keeplock, with its attendant sanction of loss of *all* or almost all privileges, is to be equated with "lesser penalties such as the loss of privileges", *id.* at 571–72 n. 19, keeplock qualifies under *Wolff*, as a form of "disciplinary confinement" (referred to alternatively by the Court as " 'solitary' confinement"). See also *Mawhinney v. Henderson, supra*, 542 F.2d 1, 4 (2 Cir. 1976).

■ Turning to our own cases, we have intimated that the differences in nomenclature among the various forms of punitive (or disciplinary) confinement should not be dispositive in determining whether minimal due process is required. First, in *United States ex rel. Walker v. Mancusi*, 467 F.2d 51 (2 Cir. 1972), *aff'g* 338 F.Supp. 311 (W.D. N.Y.1971), we implicitly found segregation in a special housing unit to be a substantial deprivation, but held that the procedures employed by the Adjustment Committee "were sufficient to satisfy minimum requirements of 'fair play.' " 467 F.2d at 54, citing *Sostre v. McGinnis, supra*, 442 F.2d at 196. While we did not expressly hold that segregation in a special housing unit constituted a substantial deprivation, we did not find fault with the district court's conclusion to that effect, 338 F.Supp. at 314. And despite the nominal difference between seg-

**6.** We also observed in *Cunningham* that both the Supreme Court and our Court explicitly have left open the question whether even the penalty of loss of privileges may not be imposed without adequate procedural protections. *Id.* at 483; see *Baxter v. Palmigiano*, 425 U.S. 308, 323 (1976); *Mawhinney v. Henderson*, 542 F.2d 1, 3–4 (2 Cir. 1976).

regation in a special housing unit and keep-lock, we note that the deprivations in the instant case were more substantial than those in *Walker*.[7]

Next, in *United States ex rel. Larkins v. Oswald*, 510 F.2d 583 (2 Cir. 1975), we assumed without discussion that if *Wolff* were to be applied retroactively it would govern proceedings leading to confinement in a special housing unit. We denominated the punishment in *Larkins* as "solitary confinement", 510 F.2d at 584, but it is unclear whether the confinement actually was "solitary" in the narrow sense of that term or a lesser form of punitive or disciplinary confinement. The district court opinion simply said that "[t]he [Adjustment] Committee's action was to confine Larkins in HBZ for seven days with loss of yard and recreation." 364 F.Supp. 1374, 1375 (W.D.N.Y. 1973). The case illustrates that the distinctions are too fine to draw.

Most recently we decided *Crooks v. Warne*, 516 F.2d 837 (2 Cir. 1975), and *Powell v. Ward*, 542 F.2d 101 (2 Cir. 1976), aff'g 392 F.Supp. 628 (S.D.N.Y.1975). Both involved confinement in segregation or in a special housing unit. In both cases we affirmed district court orders which required advance written notice of disciplinary hearings where either kind of punishment could be imposed. *Powell v. Ward, supra*, 392 F.Supp. at 630; *Crooks v. Warne, supra*, 516 F.2d at 839. Although in *Crooks* we stated that "[i]n every case involving disciplinary proceedings governed by *Wolff* [the prisoner] should receive written notice of the charges or concerns of the committee . . . ordinarily at least 24 hours before the hearing", 516 F.2d at 839, we implied that hearings at which any form of "custodial confinement" might be imposed would qualify as "disciplinary proceedings governed by *Wolff*". Both the panel in *Crooks* and the district judge in *Powell* noted the problem

of distinguishing between "segregation" and "special housing", see 516 F.2d at 838 & n. 1; 392 F.Supp. at 630 & n. 2. As Judge Stewart stated in *Powell*, a sensible resolution of the problem is that the distinction is "unimportant" since "*Wolff* procedures apply to both special housing and segregation." 392 F.Supp. at 630 n. 2.

Based on our analysis of the cases discussed above, we find that our difficulties in trying to sort out the various and multiple forms of punishment employed by prison officials is matched only by the virtual absence of difference in harshness of impact on the prisoners, despite the differing degrees of penalty originally contemplated by prison rules and regulations. See note 9 *infra*. We conclude that keeplock is not significantly different from the other forms of punishment which we have held to constitute substantial deprivations. Accordingly we hold that the imposition of keeplock by the Adjustment Committee must be pursuant to a hearing with minimal due process safeguards.

This brings us to the practical reason for considering keeplock for a period up to two weeks as a substantial deprivation, despite the obvious difference between that kind of limited punishment and the anxiety-producing "indeterminate" confinement dealt with in many of the other cases. Obviously, the longer the confinement, the more substantial the deprivation. But neither *Wolff* nor our own cases carve out exceptions depending on the duration of the confinement. This may reflect the fact that in those cases the confinement could have been of indefinite duration.[8] In any event it is not necessary for us to decide whether terms of less than two weeks in keeplock would constitute a substantial deprivation under the Fourteenth Amendment. The State has seen fit to give a single body—the Adjust-

---

7. The conditions in the two types of confinement are similar except that, unlike the prisoners keeplocked in the instant case, the prisoners segregated in *Walker* received the minimum wages paid to inmates unassigned to jobs through no fault of their own, had commissary privileges, could receive packages from the out-

side, and had recreation during their first week of punitive confinement. 338 F.Supp. at 313.

8. For example the prison regulations involved in *Wolff* allowed confinement in a disciplinary cell "for as long as necessary". 418 U.S. at 552 n. 9.

ment Committee—the authority to impose keeplock of up to two weeks. To be workable, the procedural requirements applicable to the Board under the due process clause must depend upon the maximum penalty that may be imposed and not upon some lesser penalty that is imposed in any particular case. Here the original punishment of seven days keeplock was extended to two weeks without any further notice, interview or review. Upon the record before us, we see no principled basis for choosing an intermediate cut-off point for Adjustment Committee keeplock and preferring it over the State's determination of two weeks.[9]

 The remaining question is whether the court below erred in prescribing 24 hours advance written notice in all cases "involving keeplock". We hold that it did not.[10]

In holding that due process requires 24 hour advance written notice of the charges when an inmate is faced with loss of good

time or solitary confinement, the Supreme Court in *Wolff* reiterated that "[p]art of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact." 418 U.S. at 564, citing *In re Gault*, 387 U.S. 1, 33–34 & n. 54 (1967). The Court also reiterated the teaching of *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961), that " 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action.' " 418 U.S. at 560. While we acknowledge that a prisoner's interest in not being keeplocked wrongfully is not as great as his interest in not being placed in solitary confinement wrongfully, we conclude that reason and our prior decisions dictate that the minimal burden on the State in providing advance written no-

---

**9.** Furthermore, as plaintiffs point out, as a practical matter the Adjustment Committee cannot know before a hearing how much punishment will be imposed on a prisoner charged with misbehavior unless it has pre-judged the case. Since the Committee has the power to impose keeplock for a period up to two weeks, every hearing potentially involves the maximum term of keeplock. *Wolff v. McDonnell* sheds no light on this problem because there minor infractions could be dealt with informally and only infractions for which loss of good time or solitary confinement could be imposed came before the Adjustment Committee. Here the Committee can impose any punishment from loss of privileges to two weeks keeplock. Although the Committee probably can determine in advance of a hearing whether the charge, if substantiated at the hearing, is serious enough to warrant imposition of keeplock or only a lesser punishment such as loss of privileges, it is less probable that the Committee could determine in advance whether, for example, 4 days or 9 days keeplock is warranted as punishment. Such a pre-hearing determination would run counter to the State's own proclamations about the flexibility and counseling function of the Adjustment Committee hearing as opposed to the more clearly disciplinary function of the Superintendent's Proceeding. Compare N.Y. Code of Rules and Regulations, Part 252, with *id.* Part 253; see *Powell v. Ward, supra*, 392 F.Supp. at 629, where Judge Stewart noted that "[t]he Adjustment Committee Proceeding is 'said to be marked by flexibility and non-punitive intent in attempting

to effectuate changes in inmate attitude,' whereas the Superintendent's Proceeding is 'solely disciplinary in nature.' "

We therefore decline to accept the State's invitation to modify the judgment of the district court so as to require 24 hours advance written notice of charges only before hearings at which more than 7 days keeplock may be imposed. We express no view, however, as to how we would rule in a case involving hearings on charges for which the maximum punishment were either loss of certain privileges or keeplock of a duration so short that it could not be considered a substantial deprivation. New York does not now provide an Adjustment Committee (or other disciplinary or adjustment official or tribunal) with such very limited powers.

**10.** We wish to make clear however that nothing in this opinion or in the judgment below affects the present state of the law as to the timing of the hearing. If prison authorities determine that an inmate's continued presence in the general prison population poses a threat to his own safety or to the safety of others, they may confine such an inmate as long as a hearing follows as soon as is practicable. See *Crooks v. Warne, supra*, 516 F.2d at 839; *Bloeth v. Montanye*, 514 F.2d 1192, 1194 (2 Cir. 1975). In particular, nothing in the district court judgment or in this opinion relates to the keeplocking of plaintiffs immediately after the laundry-room incident on June 5 and until the Adjustment Committee hearing could be held.

tice is outweighed by the interests of the charged prisoner. See *Crooks v. Warne, supra; Powell v. Ward, supra*.[11] We affirm the 24 hour notice provision of the district court judgment.

### (2) *Scope of the Judgment*

 The parties have raised some questions as to whether the last paragraph of the judgment is injunctive in character rather than merely declaratory. We construe it as declaratory only. The district court opinion states that plaintiffs are to be granted "declaratory relief under their first cause of action". 425 F.Supp. at 393. This is the only claim before us. The judgment itself, in the same paragraph that provides "plaintiffs' first claim for relief is granted" goes on to provide unequivocally that "plaintiffs' prayer for equitable and monetary relief respecting this claim is denied". Clearly the judgment does not grant injunctive relief.

 Even as to declaratory relief, moreover, the fact that this suit is not a class action precludes the judgment from being applied to prisoners other than the three named plaintiffs. The judgment therefore is modified to apply only to Adjustment Committee proceedings involving these plaintiffs.

Affirmed as modified. No costs.

11. Advance notice of charges has many salutary effects. It compels the charging officer to be more specific as to the misconduct with which the inmate is charged; it serves to narrow the inquiry at the hearing to the misconduct alleged; it informs the inmate of what he allegedly has done so that he can prepare a defense, if he chooses, to the specific charges set forth, based on whatever evidence he can muster, given the limited time available and the lack of an opportunity to interview or call witnesses; and it aids the fact finder to reach an informed decision. Note, Decency and Fairness: An Emerging Judicial Role in Prison Reform, *supra*, at 868, 873. The notice requirement also assures a degree of fairness in the proceedings so that an inmate is not summarily brought before a three-member panel and required on the spot to explain vague charges set forth in a misbehavior report which he has never seen.

We find no merit in defendants' contention that Judge Stewart's decision destroys the so-called "flexibility" of the "two-tiered discipli-

nary system" in New York's correctional institutions. The Adjustment Committee has the power to mete out punishment that is comparable in severity, if not in duration, to the sanctions at the disposal of the Superintendent's Proceeding officer. If the Adjustment Committee were truly one step in a two-tiered disciplinary system, its sanctions would not include the substantial punishment given to the prisoners in the instant case, but would be limited to the power to impose minor penalties such as loss of privileges. Furthermore, the claimed remedial and guidance purposes of the Adjustment Committee proceeding, if in fact an integral part of the hearing procedure, might validly distinguish the two procedures and lend credence to the contentions of the corrections officials as to the desirability of maintaining flexibility. The record in the instant case, however, indicates that the Adjustment Committee was concerned primarily with certain bare facts such as whether the particular inmate was present during the incident in question as charged in the misbehavior report.