**Rosco VICE, Plaintiff,**

v.

**Warden HARVEY, Kirkland Correctional Institution, Officer Pardue, Joe Martin, Warden, Central Correctional Institution, and William D. Leeke, Commissioner, S.C.D.C., Defendants.**

Civ. A. No. 77–1515.

United States District Court, D. South Carolina, Columbia Division.

Sept. 13, 1978.

Rosco Vice, pro se.

Emmet H. Clair, Asst. Atty. Gen., Columbia, S. C., for defendants.

## ORDER

BLATT, District Judge.

This court, by its Order dated March 28, 1978, disposed of plaintiff's various § 1983 claims involving hygiene and interprison transfers reserving for decision, after receiving requested additional information, a disposition of the issue involving the summary imposition of administrative segregation for disciplinary infractions. The requested information has been provided to the court so this issue is now ripe for decision.

The basic facts pertaining to the remaining claim are set forth in this court's Order of March 28, 1978, and are briefly repeated here. Plaintiff was in the process of being transferred from the Kirkland Correctional Institution (KCI) to the Central Correctional Institution (CCI) on June 2, 1977, for "interference with an officer in the performance of his duty and his general attitude"—(4/21/78 affidavit of Warden James L. Harvey)—when he committed a violation of disrespect to an officer.[1] For this of-

1. Although the infraction which has fostered this litigation may seem minor to a layman—(profanity used in conversation with a guard)—the prison authorities regard such conduct—(with good cause)—in the context of the strictly controlled prison environment, as evincing a dangerous lack of respect for prison authority, making such conduct a major violation of prison decorum, and they impose major penalties for it. This is evident from the sentence imposed at plaintiff's hearing—six months loss of accrued statutory good time and six months administrative segregation—the maximum sentence allowed by the 1977 Inmate Guide, see § 4.9(L). In addition, the affidavit of the Warden of Central Correctional Institution (CCI) speaking of the procedure followed in investi-

gating a major violation, supports such a finding:

". . . An alleged violation occurs and if severe or violent, the individual is likely to be placed on lock-up status pending an investigation. We have thirty days to investigate the allegations and/or acts and bring a charge against the individual."

This language tracks that of the Inmate Guide § 3.3.

"3.3 *Major Violations*
You may be placed in Administrative Segregation (lock-up), depending on the seriousness of the violation. In such cases you will be advised, in writing, within 24 hours as to the nature of your offense. Charges will be filed within 30 days after you are placed in

fense, he was placed in administrative segregation upon arrival at CCI, instead of being housed in the general prison population.[2] On June 6, 1977—(or at least by June 18th according to plaintiff)—plaintiff received notice of the charge but refused to attend his Institutional Adjustment Committee (IAC) hearing on July 1, 1977, at which time he was given six (6) months administrative segregation and six (6) months loss of good time. Plaintiff here does not—(nor could he)—challenge the substantive findings of the IAC, but instead argues that the *timing* of the hearing was improper, *i. e.*, that he should have received a hearing before his reclassification for punitive reasons.

 As the recent Supreme Court pronouncements in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) as well as the statements by the Fourth Circuit Court of Appeals in *Cooper v. Riddle*, 540 F.2d 731 (4th Cir. 1976) make clear, a prisoner may be transferred to another institution for administrative—(*Meachum, Cooper*)—or disciplinary—(*Montanye*)—reasons without a hearing, absent a state statute giving such prisoner a reasonable expectation that he will remain where he is confined.[3] As stated in· *Montanye v. Haymes, supra*, at 242, 96 S.Ct. at 2547:

> "The [Due Process] Clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive."

However, in *Montanye v. Haymes*, the Court expressly recognized that:

> "No loss of good time, segregated confinement, loss of privileges, or any other disciplinary measures accompanied the transfer." *Id.* at 238, 96 S.Ct. at 2545.

 In the present case, in contrast, the first two of these enumerated additional consequences of the disciplinary infraction are present and call for a *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) hearing as the parties have recognized.[4] The question of the tim-

---

Administrative Segregation; in cases of unusual circumstances where additional investigation is necessary for a fair hearing, you will be notified, in writing, of the continuance of your Administrative Segregation. In the event you are convicted by the Adjustment Committee, you will be given credit for all time served on lock-up prior to the hearing."

2. A pre-transfer hearing was held—(although not constitutionally required under *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976))—on the decision to make the initial transfer *before* the incident which led to the summary imposition of administrative segregation occurred. It is the ·events surrounding the summary segregation which presently concern this court, not the transfer decision itself.

3. The court notes that S.C. Code § 17–13–120 (1976) entitled *"Persons shall not be removed from one prison to another without cause"* appears at first glance to arguably provide such an expectation. However, it is clear that the statute applies to pretrial detainees, and not to prisoners convicted of the offense in question who are committed to the discretion of the Department of Corrections via S.C. Code § 24–3–30 (1976). Such a conclusion flows from (1) the placement of § 17–13–120 in the chapter of the Code dealing with "Arrest, Process, Searches and Seizures"; (2) the language of the section allowing the transfer of a prisoner to a designated place for "his trial"; (3) the application of the section by the Supreme Court of South Carolina to pretrial situations. *See, State v. Harvey*, 253 S.C. 328, 170 S.E.2d 657 (1969)—[no error presented in refusal to quash indictment on ground of alleged illegal removal from county jail]; *State v. Orr*, 225 S.C. 369, 82 S.E.2d 523 (1954), *cert. denied*, 348 U.S. 848, 75 S.Ct. 74, 99 L.Ed. 669 (1954)— [plaintiff incarcerated on an unrelated charge challenged his transfer to court for trial on forgery charge—Court assumed without deciding that section was applicable—since, in relation to the forgery charge plaintiff was *not* yet convicted, the section could apply to him]; *State v. Brown*, 212 S.C. 237, 47 S.E.2d 521 (1948), *cert. denied*, 335 U.S. 834, 69 S.Ct.· 22, 93 L.Ed. 386 (1948)—[confession made by arrestee after alleged transfer in violation of section admissible against him]; and (4) the commitment of convicted prisoners to the custody of the Department of Corrections with full discretion in such body to control the designation of a place of confinement. S.C. Code §§ 24–3–20(a), 24–3–30 (1976).

4. South Carolina, as did Nebraska in *Wolff v. McDonnell*, has created the right to good time and recognized that its deprivation is a sanction imposed for major misconduct. *Compare, Wolff v. McDonnell*, 94 S.Ct. at 2975 with S.C.

ing of the hearing requires this court to focus on the nature of the interests protected, and to balance the competing interests of the prisoner desiring to be heard before suffering serious consequences and the duty of prison authorities seeking to maintain prison order. In a different context, the Supreme Court has grappled with the interests of a judgment debtor and his creditor in deciding the *timing* of a seizure hearing concerning a debtor's assets. *Compare, C.I.R. v. Shapiro,* 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976); *North Georgia Finishing, Inc. v. Di-Chem,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W. T. Grant, Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). These cases, while differing in their results and involving property interests alone, rather than the combination of property and liberty interests involved here, sustain the principle that a careful weighing of the respective interests involved is required to determine the contours of due process in each case. As the deprivation of rights becomes more severe, the procedures which must be followed to constitutionally effect such deprivation become more stringent. As the Supreme Court has recently said:

> "This Court has recently and repeatedly held that, at least where irreparable injury may result from a deprivation of property pending final adjudication of the rights of the parties, the Due Process Clause requires that the party whose property is taken be given an opportunity for some kind of predeprivation or prompt post-deprivation hearing at which some showing of the probable validity of the deprivation must be made." *C.I.R. v. Shapiro, supra,* at 1072. *See also, Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 99, 98 S.Ct. 948,

960, 55 L.Ed.2d 124 (Marshall, J., dissenting) (1978).

The Court has also indicated that an analogous interpretation of Due Process protection should be applied to deprivations of "liberty" interests:

> "This analysis as to liberty parallels the accepted due process analysis as to property. The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests." *Wolff v. McDonnell, supra,* 94 S.Ct. at 2975.

Although an argument can be made that a prisoner suffers irreparable and final deprivation of his freedom the moment he is placed in segregation—(*i. e.,* that a day spent in segregation is lost forever to a human being with a finite life expectancy) —and that a hearing must always *precede* such action, the Supreme Court has indicated that a person's liberty can be summarily restricted temporarily in certain circumstances. Thus, in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Court held that an arrestee may be held temporarily while a "prompt" probable cause determination is made. However, *Wolff v. McDonnell, supra,* indicated that normally advance notice should accompany any imposition of "solitary confinement"—(94 S.Ct. at 2982 n. 19)—but that Court did not speak in detail to the exact situation presented here where many of the incidents of traditional solitary confinement are absent (see, page 1038, *infra.*) The indications from that opinion, and the later pronouncement in *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), are that less stringent due process procedures are involved as a less severe penalty is contemplated. These cases represent a specific application of the established maxim that:

> " ' . . . "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time,

Code § 24–13–210 and Inmate Guide § 3.9(A)(6), § 3.3. As to administrative segregation, *compare, Wolff v. McDonnell, supra,* 94 S.Ct. at 2982 n. 19 with Inmate Guide § 3.2(B)(4), § 3.3, § 3.9(A)(5). (Since good time

is not revoked until after a hearing, it is only in connection with administrative segregation that the timing of a hearing becomes important.)

place and circumstances.'" *Mathews v. Eldridge,* 424 U.S. 319 at 334, 96 S.Ct. 893 at 902, 47 L.Ed.2d 18. *See also, Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

The Courts of Appeals' decisions which have considered factual situations related to that here involved have illustrated an accommodation between the two competing forces expressed in *Wolff v. McDonnell, supra,* 94 S.Ct. at 2978:

> "With some, [prisoners], rehabilitation may be best achieved by simulating procedures of a free society to the maximum possible extent; but with others, it may be essential that discipline be swift and sure."

In *Aikens v. Lash,* 514 F.2d 55 (7th Cir. 1975), *vacated* and *remanded,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976), *opinion on remand,* 547 F.2d 372 (7th Cir. 1976), the Court modified its earlier opinion which had mandated that prison authorities provide a statement of reasons for refusal to allow cross-examination, which requirement ran afoul of *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); however, it left standing its requirement of written notice—(two days)—*before* disciplinary confinement could be imposed, noting (at 372, n. 1) that neither *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) nor *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) affected the situation present there—(and here)—where disciplinary confinement or segregation was involved. In *Gray v. Creamer,* 465 F.2d 179, 185 (3rd Cir. 1972), a decision anticipating *Wolff v. McDonnell,* the Court said:

> " . . . that the transfer of a prisoner from the general prison population to solitary confinement without either notice of the charges or a hearing [6] does not, absent unusual circumstances not evident in the pleadings, meet minimal due process requirements."

The footnote cited in that sentence explained:

[6] This is not to say, of course, that this notice or hearing must in all cases precede the transfer to solitary confinement; in some cases, as, for example, during a prison riot, notice and hearing must be delayed a reasonable period of time.

The Third Circuit Court of Appeals elaborated on its holding in the later case of *Biagiarelli v. Sielaff,* 483 F.2d 508 (3rd Cir. 1973), when it held that a prisoner whom authorities suspect of planning to escape can be held in solitary for a reasonable time without a hearing. However, the Court was careful to note:

> "This was not the ordinary case of a prisoner being placed in administrative or punitive segregation for disciplinary purposes, . . ." at 511–12.

The Eighth Circuit in a post-*Wolff v. McDonnell* case approved a three-day lapse between administrative confinement and formal disciplinary action. *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 207 (8th Cir. 1974). In a case involving both a transfer and segregation, the Seventh Circuit held that a prisoner who committed a violation on Friday could be held until the following Monday in segregation without a hearing. *Bickham v. Cannon,* 516 F.2d 885 (7th Cir. 1975). The Court cited the possibility of violence in the prison as the result of the prisoner's infraction—(stealing a fellow inmate's radio)—the increased risk of escape created by a prisoner facing discipline, and the effect upon other inmates in the "honor unit" of the continued presence in their midst of one charged with a violation of the prison honor system. *Id.* at 886. The Court approved as a general rule a "prompt" hearing after a "brief" period in isolated confinement. *Id.* at 886.

More recently, this evolving area of the law has received further treatment. The Second Circuit Court of Appeals in *McKinnon v. Patterson,* 568 F.2d 930, *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792, held that twenty-four hours notice must precede confinement of an inmate in "keeplock" status except when his continued presence in the general population would pose a safety threat. The Court expressed

concern about the varying nomenclature used by prison officials to refer to different levels of confinement and held that, in the circumstances there recited, the "keeplock" status imposed approached, but did not reach, traditional notions of "solitary confinement," and was still controlled by *Wolff v. McDonnell, supra,* mandating advance written notice. (568 F.2d at 939).

The West Virginia Supreme Court of Appeals, in *Tasker v. Griffith,* 238 S.E.2d 229 (W.Va. 1977), determined that an inmate confined in "administrative segregation" pending investigation of his alleged disciplinary infraction could not be held in that state for more than three (3) days without a hearing, and that such inmate must receive notice of the charges against him before he is segregated. The Court was also concerned with the nomenclature used by prison authorities, and declared that it was particularly focusing on:

> "something which looks and feels like punishment but which is denominated 'administrative segregation.'" 238 S.E.2d at 234.

Even more recent is the decision in *Wright v. Enomoto,*[5] 22 Cr.L. 4070 (3-Judge Court N.D. Cal.1976) *aff'd. without opinion,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). In that case, it appeared that applicable prison regulations provided for advance notice and a hearing "when possible" for prisoners "transferred" to maximum security status from the general prison population for "administrative" reasons. The Three-Judge Panel, on the basis of the record before it, enjoined any such transfers unless a potential transferee was given written notice in sufficient detail to enable the prisoner to prepare a response either before, but in no case more than 48 hours after, such placement. In addition,

the Court held that prisoners were entitled to a fair hearing within 72 hours of their transfer, unless they requested more time to prepare a defense. While the opinion speaks of "administrative"—(parenthesis of the Three-Judge Panel)—segregation, it is apparent from its discussion of giving the prisoner time to prepare his "defense" that the Court was there speaking of administrative segregation which "looked and felt like punitive segregation." To this extent, the case differs from the Fourth Circuit Court of Appeals opinion in *Cooper v. Riddle,* 540 F.2d 731 (4th Cir. 1976), where the court noted that the transfer was:

> " . . . not used to . . . punish an inmate, and its foremost consideration is the safety and welfare of both the inmates and the institution." *Id.* at 731. *See also, Altizer v. Paderick,* 569 F.2d 812 (4th Cir. 1978).

■ From the preceding discussion, it is apparent that there is presently no single solution which will deal with the problem of adequate due process in the myriad of classification systems in use today in the nation's prisons. A distillation of the recent precedents appears to recognize a "sliding scale" of due process, with *Wolff v. McDonnell,* at one end of the spectrum mandating the most complete due process procedures for the most severe deprivations of liberty through reclassification, and *Meachum v. Fano* and *Montanye v. Haymes* at the other end of the spectrum, requiring no due process for mere "lateral" transfers unaccompanied by independent "grievous losses" to personal liberty. In between these extremes, the courts have sought, by comparing the particular incidents of the classification under consideration to those involved in the decided cases, to fit the procedural safeguards required to the deprivation im-

---

**5.** One must be cautious in interpreting the value of the *Wright v. Enomoto* precedent, because, as the Supreme Court has recently reminded the lower courts:

> " . . . lower courts are bound by summary actions on the merits by this Court, but we noted that '[a]scertaining the reach and con-

tent of summary actions may itself present issues of real substance' . . . .. Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below." *Mandel v. Bradley,* 432 U.S.

posed.[6] With that in mind, the court turns to a consideration of the notice and hearing requirements in the present case.[7]

The Inmate Guide used by plaintiff's institution requires written notice within 24 hours of lock-up—(1977 Inmate Guide at 29)—a procedure not followed in this case in that the record reflects at least four, and more probably sixteen days, between lock-up and notice. Although it is true that an *administrative* transfer and reclassification does not require any advance notice, or any notice at all, *Altizer v. Paderick*, 569 F.2d 812 (4th Cir. 1978), and that a failure to give such notice, even when required by prison regulations, is not a constitutional violation, a different rule has evolved where a *punitive* reclassification is involved and is sufficiently severe to bring *Wolff v. McDonnell, supra,* into play. (*Enomoto v. Wright; Tasker v. Griffith, supra; McKinnon v. Patterson, supra*). Here the affidavit of defendant Martin clearly reveals that plaintiff received a punitive reclassification.

"Had inmate Vice not violated institutional rules, he would not have been placed on lock-up status. Not all inmates are placed on lock-up status by virtue of an institutional transfer, absent the violation of an institutional rule we have no reason to so treat the inmates." (12/21/77 affidavit of Warden Joe Martin).

The Second Circuit in its recent opinion detailed the effects of advance or reasonably contemporaneous notice in cases of severe custody reclassification:

"Advance notice of charges has many salutary effects. It compels the charging officer to be more specific as to the misconduct with which the inmate is charged; it serves to narrow the inquiry at the hearing to the misconduct alleged; it informs the inmate of what he allegedly has done so that he can prepare a defense, if he chooses, to the specific charges set forth, based on whatever evidence he can muster, given the limited time available and the lack of an opportunity to interview or call witnesses; and it aids the fact finder to reach an informed decision. Note, Decency and Fairness: An Emerging Judicial Role in Prison Reform, *supra,* at 868, 873. The notice requirement also assures a degree of fairness in the proceedings so that an inmate is not summarily brought before a three-member panel and required on the spot to explain vague charges set forth in a misbehavior report which he has never seen." *McKinnon v. Patterson,* 568 F.2d at 940, n. 11.

In this case, therefore, if the "lock-up" imposed on the plaintiff is tantamount to "solitary confinement" (*Wolff v. McDonnell*) or "keep-safe" (*McKinnon v. Patterson*) or "looks and feels" like either even though denominated "administrative segregation" (*Tasker v. Griffith*), both the due process clause and the defendant's own guidelines would warrant relief.

Turning to the issue in this case, namely, the determination whether a "lock-up" is

---

173 at 176, 97 S.Ct. 2238 at 2240, 53 L.Ed.2d 199 (1977). *See also,* 64 Va.L.R. 117 (1978).

**6.** In addition to the cases cited, these lower courts have considered the problem involved here, either directly or in dicta: *Hardwick v. Ault,* 447 F.Supp. 116 (M.D.Ga.1978) [advance notice required before transfer to "last resort disciplinary cell" for violations of prison rules]; *United States ex rel Wolfish v. Levi,* 439 F.Supp. 114, 156 (S.D.N.Y. 1977) [notice within 24 hours of infraction, hearing within 48 hours]; *Tinch v. Henderson,* 430 F.Supp. 964 (M.D.Tenn. 1977) [advance written notice, no confinement over 18 hours without Warden signing "probable cause" certificate, "prompt" hearing—in that case 2 day lapse held prompt]; *Jordan v. Arnold,* 408 F.Supp. 869 (M.D.Pa.

1976) [prison violated its own 3 day policy by holding plaintiffs 7 days without hearing]; *Patterson v. Riddle,* 407 F.Supp. 1035 (E.D.Va. 1976) [notice held sufficient, but 10 month delay in hearing not "prompt"]; *United States ex rel Lewis v. Johnson,* 393 F.Supp. 312 (E.D.Pa. 1975) [30 day delay violated prison's own rule and due process]. Since several of the above cases do not contain a full exposition of the incidents of the particular segregated status involved, it is difficult to draw any rule from them and they are, at best, only guidance to this court.

**7.** The plaintiff (as noted) has not challenged his hearing *per se,* only the 30 day delay in securing such a forum.

coterminous with the classifications discussed above,[8] little can be gleaned from the Supreme Court's mention of "solitary confinement" in *Wolff v. McDonnell* except that the classification there involved appears to have been very close to the layman's vision of "solitary" which most have experienced—(happily)—only in old-time gangster movies. For instance, the Court said:

> "When a prisoner is isolated in solitary confinement, there appear to be two different types of conditions to which he may be exposed. He may be incarcerated alone in the usual 'disciplinary cell', with privileges severely limited, for as long as necessary, or he may be put in a 'dry cell', which unlike regular cells, contains no sink or toilet." 94 S.Ct. 2972–3, n. 9.

In *McKinnon v. Patterson, supra*, the court identified "keeplock" status as one step above solitary confinement—(568 F.2d at 936)—but recognized that "it is arguable that even 'keeplock' comes under *Wolff*," (*Id.* at 936). The court explained that "keeplock" involved an "attendant sanction of loss of *all* or almost all privileges"—(emphasis of *McKinnon* court *id.* at 937)—and held, on its reading of *Wolff*, its prior cases, and what it termed "practical considerations", that *Wolff* should apply to the imposition of "keeplock" for punitive reasons.

In response to this court's Order of March 28, 1978, Warden Joseph R. Martin has detailed the incidents of "lock-up" status as practiced at the institution where plaintiff is confined. (Affidavit of April 24, 1978). With this information, it is apparent that this type of "lock-up" does not approach either "solitary confinement" nor "keeplock" in severity of deprivations. While an inmate's freedom of movement within the institution is reduced, the inmate is allowed out of his cell, with an accompanying correctional officer, to receive visitors, to shower twice a week, to go to the mailroom when necessary, to be out twice a week for recreational periods, to visit the library once a week, to attend sick call or the dental clinic as needed, and to go to the inventory room to retrieve personal items, for telephone calls, and when an official or an authorized individual calls for the inmate. Additionally, in contrast to the old-time "bread and water" diet of solitary confinement, inmates in "lock-up" status receive the same meals as other inmates unless they require special diets. The foregoing illustrate that the main deprivation suffered by a prisoner placed in "lock-up" is clearly described by the name of the confinement, *i. e.*, he is locked up in his cell while general population inmates are allowed to mingle in "dormitory" hallways or the prison yard. However, even this restriction is greatly minimized by the extensive list of exceptions heretofore set forth, all of which allow the inmate out of his cell for designated functions. The court feels that the loss of the privilege of freedom of movement within the institution in the degree described above does not rise to the level of deprivation envisioned by the *Wolff v. McDonnell* Court to require due process procedures beyond those presently in effect. Keeping in mind that

---

8. If it is, then a hearing before segregation would be mandated by *Wolff v. McDonnell*, 94 S.Ct. at 2982 n. 19:

> "Although the complaint put at issue the procedures employed with respect to the deprivation of good time, under the Nebraska system, the same procedures are employed where disciplinary confinement is imposed. The deprivation of good time and imposition of 'solitary' confinement are reserved for instances where serious misbehavior has occurred. This appears a realistic approach, for it would be difficult for the purposes of procedural due process to distinguish between the procedures that are required where good time is forfeited and those that

> must be extended when solitary confinement is at issue. The latter represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges."

"[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Board of Curators of University of Mo. v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1978). this court is not passing upon the question of whether more grievous losses of a prisoner's freedom of movement within the institution would pass muster under a procedure not providing for a prompt pre-deprivation, or more contemporaneous, hearing. It is enough to say now, considering the totality of the circumstances here, balanced with the interests of the inmate and prison authorities, that this court has concluded that due process was not violated in this instance. This decision is reached, not because this court necessarily approves the summary confinement of inmates who may ultimately be found not guilty of an accusation, but because the summary sanction imposed here was relatively mild on the sliding scale of "punitive confinements" in that it involved loss of privileges to a moderate degree rather than the traditional incidents of solitary confinement.

■ While the defendants did violate their own regulations by providing the plaintiff written notice of his charges four —(or sixteen)—days rather than 24 hours, after his confinement, in view of the determination by this court that there was no constitutional due process violation in this procedure in the absence of any allegation of intentional discrimination against this plaintiff, the failure to strictly follow administrative regulations does not in itself rise to constitutional proportions.[9]

■ Additionally, because this plaintiff acting *pro se* cannot represent a class, (*Oxendine v. Williams*, 509 F.2d 1405 (4th Cir. 1975)), and since he was given credit for the pre-hearing time spent in confinement, and then refused to even attend his hearing, he has not suffered from the delay in receiving notice of the charges against him, nor from his pre-hearing confinement. In the context of this case, the plaintiff has thus failed to prove any damages resulting from any possible constitutional or regulatory violations. The Supreme Court recently observed in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978):

"Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect." 98 S.Ct. at 1047.

In *Carey*, the Court rejected the notion that injury may be presumed from every violation of constitutional rights—(98 S.Ct. at 1051–1052)—and held that to recover more than nominal damages—(not to exceed one dollar, 98 S.Ct. at 1054)—actual injury must be proved. In the present case, since no constitutional violation is present, no damages are warranted, and the particular facts of this case would not warrant damages even were plaintiff's constitutional rights violated. For the foregoing reasons, it is

ORDERED, that the defendants' motion for summary judgment be granted.[10]

AND IT IS SO ORDERED.

---

9. The court notes that Judge Robert F. Chapman recently held that "It is clear that prison officials can isolate a troublemaker pending a disciplinary hearing." *Feaster v. Leeke*, (C/A # 77–2441 at 2, n. 3, 2/21/78). Judge Chapman reaffirmed his holding on this point in *Kennedy v. Leeke*, (C/A 77–2442, 8/25/78). His observation would seem to apply here as well since disrespect to an officer—(the offense with which plaintiff here was charged)—can reasonably be expected to present a potential security problem if such disrespect goes uncorrected for a period of time.

10. As this Order was being prepared, the Fourth Circuit Court of Appeals issued an un-published opinion in which a prisoner transferred without notice of a hearing to a "more isolated, less desirable basement cell and retained in the latter for approximately 18 days" sued his jailers under § 1983. The Fourth Circuit reversed an award of damages to the defendant holding that there was a valid reason for the transfer and that certain statements made by the prisoner could in the "unstable environment of a jail" have amounted to a security threat. While not a full opinion, the *per curiam* Order appears to recognize the validity of several of the principles discussed in this opinion pertaining to emergency lock-ups and loss of privileges *vis a vis* traditional solitary confinement.